Brian S. King, #4610
Brent J. Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
nediha@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NANCY S., and S. S.,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>ANTHEM BLUE CROSS and BLUE SHIELD,<br><br>　　　　Defendant. | COMPLAINT<br><br>Case Number 2:19-cv-00231 BCW |

Plaintiffs Nancy S. ("Nancy") and S. S. ("S."), through their undersigned counsel, complain and allege against Defendant Anthem Blue Cross and Blue Shield ("Anthem") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Nancy and S. are natural persons residing in Washtenaw County, Michigan. Nancy is S.'s mother.

2. Anthem is the trade name of Healthy Alliance Life Insurance Company located in Missouri. Anthem is an independent licensee of the nationwide Blue Cross and Blue

1

    Shield network of providers and was the insurer and claims administrator for the health insurance plan ("the Plan") providing coverage to Nancy and S. during the treatment at issue in this case.

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Nancy was a participant in the Plan and S. was a beneficiary of the Plan at all relevant times.

4. S. received medical care and treatment at Solstice East ("Solstice") from January 6, 2016, to May 30, 2017. Solstice is a residential treatment center located in North Carolina which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Anthem, acting in its own capacity, or through its subsidiary and affiliate Anthem UM Services, denied claims for payment of S.'s medical expenses in connection with her treatment at Solstice. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Nancy for the medical expenses she has incurred and paid for S.'s treatment.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because Anthem does business in Utah through its network of affiliates. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### S.'s Developmental History and Medical Background

9. S. biological parents were reportedly involved in gang activity and frequently neglected her during infancy. S. was placed in foster care and was subsequently adopted by Nancy. While S. had always grappled with depression, she started suffering significant symptoms of depression when she was fourteen. This was exacerbated by stress from family health problems and the fact that her adoptive parents separated. S. struggled with body image and eating disorder behaviors as well as a depressed mood and suicidal thoughts.

10. S. admitted to having anxiety and panic attacks, but claimed they generally only occurred when she was under the influence of alcohol or other substances. S. stated that she began using alcohol almost daily beginning at age 15. In addition she often used psychedelic drugs such as LSD, mushrooms, and K2, and also maintained a daily marijuana habit.

11. S. was admitted to a variety of treatment centers in an attempt to treat her underlying mental health, behavioral, and substance abuse concerns. In May of 2015 she had an acute hospitalization at the University of Michigan Psychiatric Inpatient unit for her depression and suicidal ideation. S. had written a suicide note to her boyfriend, come up with a plan to ingest chemicals, and attempted to cut her throat with scissors. She stayed

in acute treatment for over a month, and on one occasion attempted to hang herself while she was hospitalized. Residential treatment was recommended for follow up care, but Nancy elected to try less intensive measures first.

12. Following S.'s inpatient hospitalization she began to self-harm by cutting. She wrapped a sock around her neck and attempted to choke herself, and she became destructive towards property, and aggressive towards her mother. In July of 2015, S. started a partial hospitalization program. She was briefly taken back to the emergency room psychiatric ward for evaluation after making a suicidal gesture. S. was uncooperative in her partial hospitalization program and her treatment in that program was terminated in September of 2015.

13. In November of 2015, S. was admitted to the inpatient unit of Havenwyk hospital due to aggressive behavior (such as breaking her window when she was told she wouldn't be able to see her boyfriend that day) and suicidal ideation. After she completed treatment at Havenwyk, Nancy attempted to enroll S. in a Dialectical Behavior Therapy program, but S. refused to participate. S. was medically withdrawn from her first trimester of eleventh grade due to her large number of absences and failing grades.

14. S. was suspended from school between Thanksgiving and Christmas of 2015, for bullying and insubordination; she often refused to attend school and continued to express ongoing suicidal ideation. According to a March 22, 2016, letter by Christina Mueller M.D., P.L.C., S.'s depression included psychotic features, including audio and visual hallucinations and command hallucinations directing her to jump off of things.

## Solstice

15. S. was admitted to Solstice on January 6, 2016, with Anthem's approval.

16. In an unsigned letter dated January 27, 2016, Anthem denied further payment for S.'s treatment from January 27, 2016, forward. Anthem gave the following justification for the denial:

    …You went to residential treatment for your mental health condition and your stay was approved. A request was made to extend your stay. The plan's clinical criteria considers ongoing care medically necessary when progress is being made toward treatment goals, or, if there is no progress, the treatment plan is being changed so that progress will be likely. The information we have tells us that progress toward treatment goals isn't occurring and your treatment plan hasn't been changed so that progress will be likely. For this reason, the request for you to remain in residential treatment is denied as not medically necessary. There may be options to help you continue your treatment, such as outpatient services. We encourage you to discuss these options with your doctor. It may help your doctor to know we reviewed this request using the plan clinical guideline called Psychiatric Disorder Treatment – Residential Treatment – CG-BEH-03. …

17. On April 11, 2016, Nancy submitted a level one appeal of the denial of S.'s treatment at Solstice. Nancy noted that Anthem had approved 21 days of S.'s treatment and that on January 26, 2016, the day before treatment was denied, a representative from Solstice contacted Anthem to arrange a peer to peer review of the medical necessity of S.'s treatment. Anthem agreed to a peer to peer interview and Solstice contacted its clinical team to schedule an interview time.

18. The following day after business hours on January 27, 2016, Anthem contacted Solstice and stated that the decision to deny S.'s treatment had been made without engaging with the peer to peer review process.

19. Nancy took issue with the accelerated timeframe employed by Anthem and argued that in no context was it appropriate for Anthem to expect a turnaround of less than 24-hours for a peer to peer review to be arranged and conducted, and argued that it was inappropriate

5

for Anthem to terminate the peer to peer review process and deny care before the review was even completed.

20. Nancy referenced the 60 minutes documentary "Denied", an investigative report that showed that the majority of mental health residential treatment claims received by Anthem are quickly denied. She contended that Anthem was not working in the best interest of her daughter.

21. Nancy pointed out that the Plan allowed Anthem to have one of its physicians examine S. in person. She argued that Anthem had failed to utilize this provision, but encouraged it to do so, so that it could determine whether the care S. was receiving at Solstice was medically necessary.

22. She argued that Anthem's decision that S.'s care was no longer medically necessary after only three weeks of treatment was inconsistent with generally accepted standards of medical practice. She wrote that the average length of stay in a residential treatment facility was for seven to twelve months. She accused Anthem of evaluating its residential treatment under an abbreviated timeframe that it would never impose on many of its medical treatments. She voiced her disbelief that Anthem would have classified a treatment such as chemotherapy as ineffective after a period of only 21 days.

23. She contested Anthem's assertion that S. was not making progress in treatment and questioned how Anthem was even able to come to that determination given the very limited amount of time that S. spent in treatment before Anthem came to the decision to deny care, and given that it had elected not to pursue a peer to peer review with a clinician that had treated S. in person.

6

24. Nancy wrote that S. had attempted treatment in a variety of lower levels of care, and had even had short term acute interventions, without success. She contended that three weeks was not a sufficient period of time to claim that S.'s treatment plan had not been changed so that progress would be likely.

25. She claimed that contrary to Anthem's assertion, S.'s treatment plan had been changed during the three weeks that treatment had been authorized in order to accommodate medication management and therapeutic interventions among other things. She wrote that S. met Anthem's severity of illness and other criteria for continued treatment, and contended that Anthem concurred with this given that it approved three weeks of S.'s treatment.

26. She wrote that S. experienced chronic suicidal ideation with an intent to act which resulted in multiple acute level hospitalizations. In addition, she was chronically absent from school and failing her classes, and abused drugs and illicit substances which worsened her mental health problems, and she continued to experience drug cravings while in treatment at Solstice.

27. Nancy argued that because S. had a dual diagnosis of mental health conditions as well as a history of significant substance abuse, that outpatient treatment where illicit substances were more readily available would undermine any of the gains that she had made.

28. Nancy included a letter from Carryn Lund LMSW, RYT, dated March 7, 2016, with the appeal which stated in part:

> I provided psychotherapy treatment for [S. S.] (DOB [redacted]) from September to December 2015. I made the recommendation for her to seek residential treatment based on the following: persistent inability to meet ADLs including attending school, frequent aggressive behavior, labile emotions, and suicide attempts.

29. Nancy also included a copy of S.'s medical records with the appeal. These records showed that S. was placed on eating protocol precautions and had a suicide risk assessment performed due to restricting her food intake, had problems with her moods and anxiety, and had ongoing drug cravings.

30. In a letter dated May 3, 2016, Anthem upheld the denial of payment for S.'s treatment at Solstice. The reviewer gave the following justification for the denial:

> …We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to stay longer in residential treatment center care. You were getting this because you had been at risk for serious harm without 24 hour care. We understand that you would like us to change our first decision. Now we have new information from the medical record plus letters. We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason. After the treatment you had, you were no longer at risk for serious harm that needed 24 hour care. You could have been treated with outpatient services…

31. On June 6, 2016, Nancy requested that the denial of S.'s treatment be evaluated by an external review agency. Nancy argued that many of the statements raised in her level one appeal had not been addressed by Anthem. She reiterated that Anthem had the right to have one of its medical professionals examine S. in person. She encouraged Anthem to exercise this provision since its adverse determination conflicted with the recommendations of S.'s providers.

32. She wrote that S.'s dual diagnosis of substance abuse and mental health conditions had been raised in her level one appeal, but had not been addressed by Anthem in its denial.

33. Nancy expressed concern that Anthem had effectively abandoned its previous denial rationale and had replaced it with a new conflicting one. In its January 27, 2016, denial letter, Anthem denied care because "progress toward treatment goals isn't occurring and your treatment plan hasn't been changed so that progress will be likely." While the May

3, 2016, letter denied care because "After the treatment you had, you were no longer at risk for serious harm that needed 24 hour care."

34. Nancy contended that S.'s care was initially denied because S. was supposedly not making enough progress in order to further justify her treatment. After Nancy had submitted her appeal however, Anthem amended its denial rationale to state that S. had made so much progress while in treatment that a residential level of care was no longer medically necessary. Nancy pointed out that these two denial rationales conflicted with each other and gave Anthem the option to deny payment at its sole discretion regardless of whether or not S. was making progress in treatment.

35. She wrote that S. met Anthem's criteria for residential treatment care even though those criteria employed acute criteria to justify the denial of S.'s subacute care. In addition, she contended that the medical necessity of S.'s treatment was supported by the medical records, as well as the fact that Anthem authorized three weeks of care. She argued that Anthem was utilizing its own internal guidelines to evaluate S.'s care rather than the terms of the Plan.

36. Nancy included an updated copy of S.'s medical records with the appeal.

37. On August 24, 2016, the external reviewer upheld the denial of payment for S.'s treatment. The reviewer did not respond to any of Nancy's arguments, nor did they elaborate regarding which materials they had reviewed or how they had come to the adverse decision, they simply opined that "Residential mental health treatment from 1/27/16 to present for this member was not medically necessary."

38. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

39. The denial of benefits for S.'s treatment was a breach of contract and caused Nancy to incur medical expenses that should have been paid by the Plan in an amount totaling over $249,000.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

40. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

41. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

42. Anthem and the Plan breached their fiduciary duties to S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of S.'s claims.

43. The actions of Anthem and the Plan in failing to provide coverage for S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

//

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

44. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

45. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

46. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

47. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

48. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Anthem exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility

type, provider specialty, or other criteria in the manner Anthem excluded coverage of treatment for S. at Solstice .

49. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

50. Specifically, Anthem's determination that treatment to effectively address S.'s mental health and substance use disorders at Solstice was not medically necessary after only three weeks of care, despite the recommendations of her treatment team and in a way that conflicted with generally accepted standards of care was inconsistent with the manner in which Anthem evaluates the medical necessity for treatment of medical and surgical treatment provided at intermediate levels of care.

51. The violations of MHPAEA by Anthem and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

   (a) A declaration that the actions of the Defendant violate MHPAEA;

   (b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

   (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan and Anthem insured plans as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendant from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiffs for their loss arising out of the Defendant's violation of MHPAEA.

52. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for S.'s medically necessary treatment at Solstice under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 5th day of April 2019.

/s/ Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Washtenaw County, Michigan.